**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| DOLAN R. RICH, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:17-CV-00642-NKL |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**ORDER**

Plaintiff Dolan R. Rich, Jr. appeals the Commissioner of Social Security's final decision that he was not under a "disability" prior to March 28, 2016, but granting his applications for disability insurance and supplemental security income benefits under Titles II and XVI of the Social Security Act as of his fiftieth birthday, 3/28/2016. For the reasons set forth below, the Court affirms the decision.

**I.     Background**

Rich alleges that he became disabled on 1/11/2011 due to severe mental impairments of generalized anxiety disorder and PTSD, and severe physical impairments including lumbar and cervical degenerative disc disease, lumbar dextroscioliosis, cholelithiasis status post cholecystectomy, hypertension, and uncontrolled diabetes. He filed his initial applications for disability insurance and supplemental security income benefits on 5/9/2012. The ALJ held a hearing on 3/12/2014 and subsequently issued a partially favorable decision finding Rich disabled as of the date of his fiftieth birthday, 3/28/2016. Rich appealed the onset date to the Appeals

Counsel, which declined review in a letter dated 6/5/2017. Rich subsequently appealed to this Court.

## A. Medical History

Rich's disability claim is based primarily on lumbar and cervical degenerative disc disease, lumbar dextroscioliosis, cholelithiasis status post cholecystectomy, hypertension, uncontrolled diabetes, generalized anxiety disorder, and PTSD.

In July 2011, Rich was diagnosed with Type II diabetes. Tr. 353–54. Lantus insulin, Metformin, and Vitamin D were prescribed. Tr. 344.

In April 2012, Rich saw Randall, FNP. He reported low back pain due to working with heavy lifting. He experienced tingling in his feet. He was diagnosed with lumbago and diabetes mellitus (DM) type II (uncontrolled). Tr. 364. X-rays of the lumbar spine on 4/20/2012 revealed a transitional vertebra suspected at T12, minimal dextroconvex lumbar scoliosis, limbus vertebra suspected at L1, and question of cholelithiasis. Tr. 407. X-rays of the thoracic spine showed mild levoconvex scoliosis in the thoracic spine and mild dextroconvex scoliosis in the lumbar spine, as well as moderate degenerative disc disease, particularly between T6 and T10 with accentuated dorsal kyphosis. Tr. 408. X-rays of the cervical spine were significant for moderate degenerative disc disease at C5-C6 and C6-C7 and suspected prominent transverse processes at C7 bilaterally. Tr. 409.

In May 2012, Randall, FNP, examined Rich again. Rich reported continuous back pain. His blood sugar readings ranged 200–400, and had been as high as 600. Tr. 358. Imaging showed a suspected gallstone, and he was referred for an ultrasound. He was referred for diabetes education and to orthopedics for back pain. Tr. 360. An ultrasound of Rich's abdomen on

5/18/2012 showed cholelithiasis, fatty infiltration of the liver, and hypoechoic hepatic mass in the margin of the right hepatic lobe (likely representing a hemangioma). Tr. 406.

Over the next several months, Rich reported continuous pain in his chest, abdomen, and back. Tr. 395. Right upper quadrat abdominal pain was consistent with gallstones, but he wanted to wait until he had insurance to get his gallbladder removed. Tr. 396. Tylenol Arthritis was recommended. Tr. 385–86.

In February 2013, Randall, FNP, examined Rich. Rich reported pain in his neck, hernia pain, headaches, and swelling in his feet and ankles. Tr. 412. Randall advised him "not to sit for long periods of time with [his] feet dependent" and to sleep with his feet elevated; diabetic support hose were recommended to prevent swelling. Diagnoses included DM type II (uncontrolled), mixed hyperlipidemia, elevated liver enzymes, and degeneration of intervertebral disc. Lantus and Pravastatin were prescribed. Tr. 414.

In December 2013, Dr. Bustle examined Rich for diabetes and back pain. Rich described his low back pain as persistent but stable; he rated his pain an 8/10. Tr. 418, 422. Dr. Bustle noted moderate musculoskeletal pain with motion and pain radiating down Rich's legs with movement. Blood sugars were running in the low 200s after restarting Lantus. DM type II (uncontrolled), lumbago, and cervicalgia were diagnosed. Lantus, Metformin, and Tramadol were prescribed. Tr. 420, 425. An MRI of Rich's lumbar spine on 12/16/13 showed diffuse hypointense marrow signal intensity. Tr. 429. An MRI of the cervical spine revealed mild cervical spondylosis without significant disc abnormality, moderate to severe left neural foraminal stenosis at C5-C6, and diffuse hypointense marrow signal. Tr. 431.

In April 2014, Dr. Bustle examined Rich. Rich reported that he was not able to afford his pain medication but was able to afford insulin and Metformin. Tr. 470. He rated his pain a 9/10.

Tr. 472.  Diagnoses included acute sinusitis, DM (uncontrolled), and hyperlipidemia.  An injection of Rocephin was given, and Amoxicillin was prescribed.  Tr. 473.

In July 2014, Dr. Bustle examined Rich again.  Rich reported low back pain and that his feet and legs were numb and sometimes swollen.  Tr. 482.  He rated his pain a 9/10.  He could not afford Hydrocodone and was using Tylenol for pain.  An exam confirmed mild pain with motion.  Tr. 485.  Diagnoses were DM (uncontrolled) and lumbago.  Farxiga, Lantus insulin, and Metformin were prescribed.  Tr. 485.

In September 2014, Rich presented to the ED with back pain, rated an 8/10.  An exam revealed tenderness of the right thoracic and lumbar costovertebral angle.  Tr. 514.  CT of the abdomen showed cholelithiasis and non-obstructing left lower pole renal calculi.  Thoracic strain was diagnosed, and Vicodin was administered.  Voltaren, Soma, and Tramadol were prescribed.  Tr. 515.  Rich saw Dr. Bustle for follow-up on 9/18/2014, again reporting back pain rated at an 8/10. His blood sugars ranged 82–200s.  Tr. 496, 499.  Invokana was prescribed.  Tr. 500.  Dr. Bustle examined Rich again on 9/25/2014.  Rich reported feeling better on Invokana and that his blood sugars were running 80–141.  He continued to have chronic low back pain.  Tr. 491.  Rich was referred to endocrinology, and Hydrocodone was prescribed.  Tr. 494.

In November 2014, Dr. Miller examined Rich.  Rich was having numbness over his entire body.  Tr. 675.  An exam revealed positive Chvostek's sign bilaterally with light tapping.  Tr. 677. Diagnoses were iatrogenic hypocalcemia and hypomagnesemia.  Magnesium replacement was started, and calcium replacement was increased.  Tr. 678.

In January 2015, Dr. Bustle examined Rich based on reported pain in his back, knees, and feet.  Tr. 739.  Hydrocodone was prescribed.  Tr. 740.

In April 2015, Dr. Bustle examined Rich for reported back pain, chest discomfort, and abdominal pain in the upper right quadrant. Tr. 726. Rich rated his pain a 9/10. An exam revealed lumbar pain with motion. Tr. 730. Hydrocodone was refilled. Tr. 731. A hepatobiliary scan on 4/20/2015 showed no evidence of acute cholecystitis. Tr. 723. Ultrasound of the abdomen showed cholelithiasis without biliary ductal dilation. Tr. 724.

In May 2015, Rich saw Dr. Joyce for gallbladder issues. He reported right upper quadrant abdominal pain that radiated to the epigastric area and right chest, and occasional attacks of severe abdominal pain. Tr. 771. He rated his pain a 10/10. Tr. 775. Diagnoses included symptomatic cholelithiasis. Tr. 777.

In June 2015, Rich presented to the ED with back pain in the bilateral thoracic area. He reported symptoms worse with movement, twisting and walking. Tenderness was noted in the right thoracic and midline thoracic areas. Tr. 787. X-rays of the thoracic spine showed thoracic spondylosis. Tr. 784–85. Morphine and Phenergan were administered; Percocet was prescribed. Tr. 790. Dr. Bustle conducted a follow-up examination, during which Rich reported worsening back pain. He had not filled his ED prescription for Percocet due to finances. Tr. 761. An exam revealed thoracic spine tenderness and moderate lumbar spine pain with motion. Tr. 764. Diagnoses included lumbar radiculitis, thoracic spine pain, and constipation. Hydrocodone and Colace were prescribed. Tr. 765.

An MRI of Rich's thoracic spine on 7/6/2015 revealed thoracic scoliosis and spondylosis, epidural lipomatosis posterior and to the left of the cord, which created deformity of the cord throughout the upper and mid aspect of the thoracic spine. Tr. 780. An MRI of the lumbar spine was unremarkable. Tr. 781.

In August 2015, Winton, ARNP, examined Rich for low thoracic pain. Rich reported worsening mid-back pain, occasional left anterior thigh pain, and bilateral foot numbness that could be painful. He reported not being able to do physical therapy due to insurance and financial reasons. Tr. 793. An exam revealed limited back ROM secondary to pain and slow, but steady gait. Diagnoses included thoracic stenosis, thoracic scoliosis, thoracic back pain, and neuropathic pain of both feet. Rich was prescribed Neurontin and referred to pain management. Tr. 794.

On 9/24/2015, Rich underwent laparoscopic cholecystectomy. Tr. 824. He was discharged the next day with diagnoses of status post laparoscopic cholecystectomy, hypomagnesemia, and type II DM. Tr. 845. In October 2015, Rich saw Dr. Joyce for follow-up. His incisions were healing well, and the umbilical hernia repair was intact. Tr. 817. Diagnoses were post-cholecystectomy and fatty changes of the liver. Tr. 821.

## B. Expert Opinions

Dr. Reagan, a psychiatrist, conducted a psychological examination of Rich in August 2012 and found him to have a global assessment of functioning score of 60, suggesting only moderate symptoms. Dr. Reagan observed that Rich had good eye contact and rapport, linear thoughts, average ability to concentrate, no difficulty following and remembering instructions, no memory issues, and no unusual mannerisms. Tr. 379–82

Dr. Eder, a non-examining, non-treating physician opined in September 2012, based upon a review of the evidence then available, that Rich would be able to perform light work. Tr. 74–75, 85–86. Dr. Eder's opinion was reviewed and affirmed by Dr. Wiggins in February 2013. Tr. 98–99, 110–11.

Joshua Boyd, Psy. D., a non-examining, non-treating State agency physician, conducted a review of the evidence of record in September 2012 and opined that Rich would be capable of

understanding and remembering simple instructions, locations, and work-like procedures and maintaining simple, paced routines with regular breaks and supervision. Tr. 72–73, 75–77, 83–84, 86–88. This opinion was reviewed and affirmed by Bill Hennings, Ph.D. in February 2013. Tr. 97, 99–101, 109, 111–13.

John Bleazard, D.O., opined, based on an April 2014 physical evaluation of Rich, that he would be limited to standing four hours a day, walking four hours a day, sitting six hours a day, and lifting forty pounds occasionally and twenty pounds frequently. Tr. 452–54, 458–60.

Dustin Keffer, D.O., opined based on a March 2015 physical examination of Rich that he had no physical limitations at all. Tr. 706–11.

### C. The Hearing before the ALJ

Rich testified that he has not worked since January 2011 when he worked for a lumber mill, sorting lumber, packaging it, and preparing it for shipment. Tr. 54. He previously held other warehouse jobs loading trucks, running a forklift, and deboning chicken. Tr. 55, 57–58. Rich attended school through the eleventh grade, but later obtained his GED. Tr. 53. He stated that he can add a column of two digit numbers, subtract some, and make change but has had trouble remembering things on and off for his whole life. Tr. 44–45, 53. He stated that if he knows what he is doing he can concentrate pretty well, but that he needs to go over new things two or three times. Tr. 54.

When asked why he could not work, Rich stated that he could not pick up anything without being in "extreme pain" and that he has neck and lower back pain. Tr. 46. He stated that he cannot stand for prolonged periods and has trouble walking and bending over. He typically rests "all day long" and tends not to get up unless he "absolutely ha[s] to." Tr. 51. Rich stated that he is depressed that he is not able to take care of himself and depends upon his mother and girlfriend.

Tr. 54.  Rich testified that he would like to get counseling if he had insurance, because "[i]t would be nice to talk to somebody other than the people that [he] live[s] with."  Tr. 54.  But he stated that he does walk his girlfriend's son to the bus stop 100 yards from his house and helps with household chores like grocery shopping, mowing the lawn, and taking out the garbage.  Tr. 52–53.

Kathy Hodgesen testified as a VE at the administrative hearing.  Tr. 56.  The ALJ posed a hypothetical question, which assumed an individual of Rich's age, education, and past work experience.  The individual could perform a full range of light work but could not stand or walk more than two hours at one time, could only sit up to 60 minutes at any one time, and needed the opportunity to stand in place for no more than 5 minutes every 60 minutes and the ability to shift from side to side at will.  The individual could not push or pull levers with his upper extremities bilaterally nor could he push or pull levers or foot pedals with his lower extremities bilaterally.  The hypothetical individual could not reach above his head; reach more than occasionally above his shoulder bilaterally; bend, twist, or turn whether seated or standing more than 15 percent of any work day; nor crawl, kneel, or climb ropes, ladders or scaffolds.  The individual could not use air or vibrating tools larger than handheld or motor vehicles.  He could not work under hazardous conditions, in temperature extremes of cold, heat or humidity, or at protected heights.  The individual could not make contact with the public and contact with coworkers and supervisors could be no more than frequent.  The individual could not carry out complex instructions and could not respond appropriately to changes in a routine work setting that involve complex instructions or tasks.  The individual could stoop, squat, crouch or climb stairs up to 15 percent of the work day.  The VE testified that such an individual could not return to the Rich's prior work and because of the sitting, walking, and reaching limitations that the individual would be limited to sedentary unskilled work.  Tr. 59.

The ALJ posed a second hypothetical question reducing the full range of light work to sedentary work, but incorporating all of the previous assumptions. The VE testified that such an individual could perform the sedentary unskilled positions of final assembler, table worker, or finisher. Tr. 60.

At Rich's request, the ALJ ordered an orthopedic consultative evaluation and agreed to leave the record open to allow the submission of additional medical evidence.

### D. The ALJ Decision

The ALJ determined Rich suffered from severe impairments of generalized anxiety disorder, posttraumatic stress disorder traits, nicotine abuse, lumbar dextroscoliosis, cholelithiasis status post cholecystectomy, cervical and lumbar spine degenerative disc disease, hypertension, and diabetes mellitus. Tr. 20. The ALJ found that Rich was not under a "disability" as defined in the Act, 20 CFR Part 404, Subpart P, Appendix 1, and concluded Rich has the residual functional capacity:

> [T]o perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that he cannot stand or walk more than 2 hours at any one time; when seated, he can only sit up to 60 minutes at any one time; he needs the opportunity to perform an ergonomic shift to stand in place for no more than 5 minutes every [60] minutes; he needs the ability, while seated, to shift from side to side at will; he cannot push or pull levers with his upper extremities bilaterally; he cannot push or pull levers or foot pedals with his lower extremities bilaterally; he cannot reach above his head; he cannot reach more than occasionally above his shoulders bilaterally; bending, twisting, or turning, whether seated or standing, is no more than 15% of any workday; he cannot crawl, kneel, or climb ladders, ropes, or scaffolds; up to 15% of the workday, he can stoop, squat, crouch, and climb stairs; he cannot use air or vibrating tools larger than handheld; he cannot use motor vehicles; he cannot work under hazardous conditions or at unprotected heights; he cannot work in temperature extremes of cold, heat, or humidity; there can be no contact with the public; contact with coworkers and supervisors can be no more than frequent; he cannot carry out complex instructions;

and he cannot respond appropriately to changes in a routine work-
setting that involves complex instructions or tasks.

Tr. 23. Relying on VE testimony, the ALJ concluded that prior to March 28, 2016 there were jobs
that existed in significant numbers in the national economy that Rich could have performed. Tr.
23. The ALJ concluded, however, that on March 28, 2016 Rich's age category changed to an
individual closely approaching advanced age, and that as of that date there are no jobs that exist in
significant numbers in the national economy that he could perform. Thus, the ALJ concluded that
Rich was not disabled prior to March 28, 2016, but became disabled on that date.

## II.    **Legal Standard**

The Court's review of the ALJ's decision is limited to a determination of whether it is
supported by "substantial evidence in the record as a whole." *Milam v. Colvin*, 794 F.3d 978, 983
(8th Cir. 2015). "Substantial evidence" is less than a preponderance but enough that a reasonable
mind might find it adequate to support the ALJ's conclusion. *Id*. The Court must consider
evidence that both supports and detracts from the ALJ's decision. But as long as substantial
evidence in the record supports the ALJ's decision, the Court may not reverse it simply because
substantial evidence also exists in the record that would have supported a contrary outcome, or
because the Court would have decided the case differently. *Andrews v. Colvin*, 791 F.3d 923, 928
(8th Cir. 2015).

Residual functional capacity is what a claimant can still do despite physical or mental
limitations. 20 C.F.R. § 404.1545(a); *Masters v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004);
Social Security Ruling 96-8p, 1996 WL 374184, *5 (July 2, 1996). An ALJ must formulate the
RFC based on all of the relevant, credible evidence of record, but "it is ultimately an administrative
determination reserved to the Commissioner." *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir.
2012) (quoting *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007)). Evidence relevant to the RFC

determination includes medical records, observations of treating physicians and others, and a claimant's own description of his limitations. *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000) (citation omitted).

## III. Discussion

Rich argues that the Commissioner's decision must be reversed because the ALJ's physical and mental RFC are not supported by substantial evidence of the record as a whole.

### A. Physical RFC

Rich contends that the ALJ's physical RFC is not supported by substantial evidence because it does not address nurse practitioner Randall's treatment notes advising him not to sit for "long periods," Tr. 414, and does not include Dr. Bleazard's assessment that Rich could never stoop or crouch, Tr. 460.

However, the ALJ included a limitation to address Randall's recommendation that Rich "not sit for long periods of time with [his] feet dependent" in the RFC. Tr. 414. The ALJ limited Rich to sitting only "60 minutes at any one time" and provided the options to stand for five minutes every hour and shift from side to side at will while seated in both his hypothetical to the VE and RFC. Tr. 414, 58 (hypothetical) ("When seated, he can only sit up to 30 – correction, 60 minutes at any one time, but he needs the opportunity to shift to perform what one might call an ergonomic shift to stand in place for no more than 5 minutes every 60 minutes. In addition, he needs the ability while seated to shift from side to side at will, that is to say from one hip to the other."); 23 (RFC) ("he needs the opportunity to perform an ergonomic shift to stand in place for no more than 5 minutes every minutes; he needs the ability, while seated, to shift from side to side at will"). Moreover, in developing the RFC, the ALJ was permitted to consider all evidence in the record. This included Dr. Bleazard's observation that Rich had "no difficulty" sitting for 30 continuous

minutes and his opinion that Rich is capable of sitting four hours at one time without interruption and up to six hours in a typical workday with periodic alternating between sitting/standing. Tr. 454, 458. Thus, the ALJ's finding that Rich can sit for sixty minutes at any one time with the option to stand each hour is supported by substantial evidence.

Dr. Bleazard concluded that Rich could "never" stoop or crouch, whereas the ALJ's RFC limited him to stooping or crouching up to fifteen percent of the workday. Tr. 23, 460. However, any alleged error is harmless because the sedentary jobs that the ALJ found Rich could perform are all "benchwork occupations" that do not require balancing, stooping, or crouching. Tr. 28; Dictionary of Occupational Titles §§ 713.687-018 (final assembler of optical goods), 731.687-014 (finisher), 739.687-182 (table worker); *see also Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012). Moreover, the ALJ was not obligated to adopt Dr. Bleazard's opinion wholesale. *See Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011). The ALJ's role was to review all of the evidence in the record as a whole in making his determination. This included evidence that Rich is able to tie his own shoes, take out the trash, and feed his dog, all activities that typically involve stooping. Tr. 46, 52, 270, 284. Thus, the ALJ's finding that Rich could stoop up to fifteen percent of the workday is supported by substantial evidence.

Rich also argues that the ALJ overstated his activities of daily living and improperly relied upon a lack of treatment modalities in making his RFC determination. But an ALJ is permitted to consider both a claimant's daily activities and pattern of conservative treatment in his disability determination. *See Bryant v. Colvin*, 861 F.3d 779, 783 (8th Cir. 2017) (daily activities); *Gowell v. Apfel,* 242 F.3d 793, 796 (8th Cir. 2001) (conservative treatment). "It is not the role of this court

to reweigh the evidence presented to the ALJ." *Henseley v. Colvin*, 829 F.3d 926, 934 (8th Cir. 2016) (citing *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2016)).

There is substantial evidence to support the ALJ's findings that Plaintiff's claims of disabling back pain were not fully consistent with his level of daily activity and conservative treatment. For example, despite his pain, Rich stated that he helps his disabled girlfriend with light housecleaning, laundry, and dishes, takes is girlfriend to her doctors' appointments and takes her son to school, sees to his own personal care without assistance, feeds his dogs, prepares meals daily, drives, shops for food and groceries, manages his own finances, spends time with family and a few friends, takes out the trash, mows the lawn, and plays games on his computer. Tr. 27 (citing Tr. 269–76, 283–88, 358). While Rich's alleged inability to pay for treatment is an important consideration, there is no evidence in the record that he declined treatment for his back pain, other than physical therapy, due to cost reasons. Advanced treatment was not recommended; rather recommended treatment for Rich's back and neck pain was conservative, consisting mostly of pain medication that "help[ed] dull the pain." Tr. 24, 793. The ALJ was also permitted to consider the inconsistency between Rich's affirmation to the state that he was ready, willing, and able to work in order to receive unemployment benefits and "his assertion during the same period that he was unable to work due to his impairments." Tr. 27.

### B. Mental RFC

Rich also argues that the ALJ's mental RFC is not supported by substantial evidence because the ALJ failed to consider third party statements of an SSA employee and relied on his own purported "medical expertise" rather than any medical evidence.

### 1. Third Party Statements

Rich argues that the ALJ's RFC is unsupported by the substantial evidence because the ALJ failed to consider the third party statements of Coffer, an SSA employee who interviewed him. Coffer's notes indicate that he observed Rich have difficulty understanding, concentrating, and writing. Tr. 259. Coffer noted:

> Clmt was cooperative, pleasant, [and] clean. He appeared to need his friend to help answer some of the questions because he could not remember medical data. He also appeared to have trouble writing the date on 827 and needed help how to write and where even though he was shown. He appeared easily confused about some of the questions and needed help how to answer or what I meant – he appeared delayed.

Tr. 259. Rich argues that because the ALJ's decision does not mention Coffer's notes, reversal is required.

While the ALJ is required to consider "any observations about the individual recorded by [SSA] employees during interviews," SSR 16-3p, an "ALJ is not required to discuss every piece of evidence submitted," nor does a failure to mention evidence necessarily indicate that it was not considered. *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)). "In general such an omission need not lead [the C]ourt to reverse an ALJ's otherwise-supported decision." *Nowling v. Colvin*, 813 F.3d 1110, 1121 (8th Cir. 2016). The Eighth Circuit has recognized the distinction between omissions coupled with other errors, which require remand, and "arguable deficienc[ies] in opinion-writing technique" with no bearing on the outcome of the case, which do not. *See id* (citing *Willcockson v. Astrue*, 540 F.3d 878, 880 (8th Cir. 2008) and *Robinson v. Sullivan*, 956 F.2d 836, 841 (8th Cir. 1992)). Specifically, where "third-party evidence supporting a claimant's complaints [i]s the same as evidence that the ALJ rejected for reasons specified in the opinion," remand is not necessary. *Willcockson*, 540 F.3d at 880 (citing *Robinson*, 956 F.2d at 841 and *Lorenzen v. Chater*, 71 F.3d 316, 319 (8th Cir. 1995)).

In this case the ALJ's written decision falls into the latter category. It is clear from the ALJ's decision that the notes concerning Rich's alleged problems understanding, concentrating, and writing were discredited by the same evidence used to discredit Rich's own statements regarding the same. The ALJ explained that contrary to Rich's alleged mental impairments he "has repeatedly been observed to have intact memory, linear thought process . . . and normal attention and concentration on objective mental status examinations." Tr. 26 (citing Tr. 360, 364, 381–82 (noting Rich's ability to repeat six serial digits forward and five serial digits forward and backward, and to understand three parables), 385 ("Judgment and thought content normal."), 396, 413, 677 ("Memory - Normal"), 682, 694 ("Memory was intact."), 715–16 ("mood and concentration appeared within normal limits."), 755). Dr. Reagan, a psychiatrist, found Rich to have an "approximately average" ability to concentrate and observed that "he had no difficulty following and remembering instructions." Dr. Reagan also opined that Rich's ability to abstract was "better than most people" he interviews. Tr. 26, 381–82. Moreover, the ALJ gave significant weight to the opinions of Dr. Boyd and Hennings that Rich was "capable of understanding and remembering simple instructions" and "maintain[ing] simple, pace routines." Tr. 26 (citing 72– 73 ("Capable of simple, routine tasks with no significant social or adoptive limitations."), 75–77, 83–84, 86–88, 97 ("ADLs do not appear to be limited by mental condition."), 99–101 ("Can understand and remember simple instructions, locations and work-like procedures."), 109 ("Clmt cognitively intact"), 111–13). Thus, the omission of Coffer's notes has no bearing on the outcome of the case and does not require reversal.

## 2. Medical Evidence to Support the RFC

Rich also argues that the ALJ's mental RFC is not supported by substantial evidence because it is based on the ALJ's "purported 'medical expertise' rather than any medical evidence."

Doc. [14], pp. 25–26. But the ALJ's mental RFC is supported by Rich's repeatedly unremarkable mental status examinations and minimal treatment. Tr. 360, 364, 381, 385, 396, 413, 677, 682, 694, 713, 764, 776, 808, 817, 835; *see also Gowell,* 242 F.3d at 796 (permitting an ALJ to consider a claimant's conservative treatment). As the ALJ noted in his opinion, Rich has not had any counseling with a psychologist or therapist[1], has not required any psychiatric hospitalization, and has not been proscribed any psychotropic medications. Tr. 26.

In addition, the mental RFC is consistent with Rich's own credible reports regarding his daily activity and social functioning. Rich stated that he has had memory problems off and on for his entire life, Tr. 22, 53, but he can pay his bills, count change and handle his checking account, Tr. 272. He testified that he can concentrate "pretty good" on tasks he knows well, but needs to go over new tasks two or three times. Tr. 54. This is consistent with the ALJ's limitation of simple instructions. Tr. 23. Regarding Rich's social functioning, the ALJ noted that Rich spends time with family and friends and interacts with others on the computer and phone. Tr. 22, 273, 287. Rich generally isolates himself, Tr. 289, and has always been "kind of a loner." Tr. 273. But he has never had problems getting along with co-workers. Tr. 22, 288. This evidence is consistent with the ALJ's limitation of no public interaction and frequent interaction with co-workers and supervisors.

The ALJ's mental RFC is also supported by the consultative psychological examination conducted by Dr. Reagan in August 2012 and the opinions of the State agency psychological consultants who reviewed the evidence of record in September 2012 and February 2013. Tr. 26, 72–73, 75–77, 83–84, 86–88, 379–82. Dr. Reagan observed "moderate" anxiety and no

---

[1] Though Rich testified that he would like to receive counseling if he had insurance, Tr. 54; there is no evidence that he was unable to get treatment that was recommended due to cost reasons.

depression, unusual mannerisms, or suicidal thoughts. Tr. 381. Rich was cooperative, made good eye contact, and established good rapport. Tr. 381. He had fair to good insight and linear thought, remembered three out of three items after five minutes, correctly explained the meaning of three parables, performed six serial digits forward and five serial digits forward and backward, had "average" concentration, and had no difficulty following or remembering instructions. Tr. 381–82. The ALJ also credited the opinions of the consultants that Rich could understand and remember simple instructions and maintain simple, paced routines with regular breaks and supervision by limiting Rich to simple instructions. Tr. 23, 26, 75–76, 86–87.

While Rich argues that the consultants' opinions were outdated, the gap in time between the opinions and the ALJ's decision is in part due to Rich's own request to submit additional medical evidence after the hearing. Tr. 61–62. Furthermore, the fact that the consultants did not have access to all of Rich's treatment records does not prevent the ALJ from relying on the consultants' opinions because Rich has not alleged a change in his condition, nor does the updated evidence undermine the consultants' opinions. *See Frankl v. Shalala*, 47 F.3d 935, 938 (8th Cir. 1995) (remanding where updated evidence reflected a "marked change" in the claimant's condition). The ALJ reviewed the updated evidence from 2015, which continued to show no problems. Tr. 776, 808, 817, 835. The record throughout illustrates that Rich has "repeatedly been observed to have intact memory, linear thought process, no unusual mannerisms, good eye contact, fluent speech, and normal attention and concentration on objective mental status examinations," and provides substantial evidence to support the ALJ's determination. Tr. 26 (citing Tr. 360, 364, 381–82, 385, 396, 413, 677, 682, 694, 715–16, 755).

With respect to Rich's alleged limitations in reading and writing, Rich argues that his limitations should have been included in the RFC. However, the record shows that Rich has had

his reading and comprehension problems since he was in school, Tr. 268, 380, but was successfully employed for many years, including in some semi-skilled jobs, Tr. 57–58, 257, 277–82. There is no evidence that any deficiencies Rich has in reading and writing would prevent him from performing the unskilled work to which the ALJ effectively limited him. *See Bryant v. Colvin*, 861 F.3d 779, 782 (8th Cir. 2017) (upholding ALJ's finding that claimant's limitation did not prevent him from working over the years, as evidenced by his good work history).

Rich had a fair hearing and full administrative consideration in accordance with applicable statutes and regulations. Substantial evidence on the record as a whole supports the Commissioner's decision.

## III.    Conclusion

For the reasons set forth above, the ALJ's decision is affirmed.


s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  July 20, 2018
Jefferson City, Missouri